20-mj-4234-DHH

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Caitlin Moynihan, a Special Agent with Homeland Security Investigations, being duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I am a Special Agent with the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement, Homeland Security Investigations ("HSI"), and am assigned to the office of the Special Agent in Charge, Boston, MA.  I have been a Special Agent since October 2009.  Prior to being assigned to the SAC Boston Office, I was assigned to the Resident Agent in Charge Office in Burlington, Vermont. As part of my duties, I am authorized to investigate violations of the laws of the United States, including criminal violations relating to child exploitation, child pornography, coercion and enticement, and transportation of minors, including but not limited to violations of 18 U.S.C. §§ 2422, 2423, 2251, and 2252A. I have received training in the investigation of child exploitation offenses, including child pornography, and have had the opportunity to observe and review examples of child pornography (as defined in 18 U.S.C. § 2256).

2.     I submit this affidavit in support of an application to search the premises located at 17 Joan Circle, Milford, Massachusetts 01757 (the "SUBJECT PREMISES"), as more fully described in Attachment A, which is incorporated herein by reference; and to seize evidence, instrumentalities, fruits of crime, and contraband as more fully described in Attachment B, which is also incorporated herein by reference.

3.     The statements in this affidavit are based in part on information provided by federal agents; written reports about this and other investigations that I have received, directly or indirectly, from other law enforcement agents, including foreign law enforcement

agencies; information gathered from the service of administrative subpoenas; the results of physical and electronic surveillance conducted by law enforcement agents; independent investigation and analysis by federal agents/analysts and computer forensic professionals; and my experience, training, and background as a Special Agent with HSI.

4.   Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2252A(a)(2) and (b)(1) (Attempted Receipt of Child Pornography) and 2252A(a)(5)(B) and (b)(2) (Access with Intent to View and Possession of Child Pornography, and attempt) are located at the SUBJECT PREMISES.

## BACKGROUND OF THE INVESTIGATION

5.   A user of the Internet account at the SUBJECT PREMISES has been linked to an online community of individuals who regularly send and receive child pornography via hidden service websites that operated on the Tor anonymity network.  The websites are described below and referred to herein as "**Website 2**" and "**Website 3**."[1]  There is probable cause to believe that a user of the Internet account at the SUBJECT PREMISES accessed **Website 2** and **Website 3**, as further described herein.

---

[1]   The names of **Website 2** and **Website 3** are known to law enforcement.  Investigation into the users of the websites remain ongoing and disclosure of the names of the websites would potentially alert active website users to the investigation, potentially provoking users to notify other users of law enforcement action, flee, and/or destroy evidence.

20-mj-4234-DHH

## The Tor Network

6.     The Internet is a global network of computers and other devices. Devices directly connected to the Internet are uniquely identified by IP addresses,[2] which are used to route information between Internet-connected devices.  Generally, when one device requests information from a second device, the requesting device specifies its own IP address so that the responding device knows where to send its response.  On the Internet, data transferred between devices is split into discrete packets, each of which has two parts: a header with non-content routing and control information, such as the packet's source and destination IP addresses; and a payload, which generally contains user data or the content of a communication.

7.     **Website 2** and **Website 3,** further described below, operate or operated on the Tor network, which is a computer network available to Internet users that is designed specifically to facilitate anonymous communication over the Internet.  The Tor network attempts to do this by routing Tor user communications through a globally distributed network of intermediary computers, or relays, along a randomly assigned path known as a "circuit." Because of the way the Tor network routes communications through the relay computers, traditional IP address-based identification techniques are not effective.

---

[2]    An "Internet Protocol address" or "IP address," as used herein, refers to a unique number used by a computer or other digital device to access the Internet.  Every computer or device accessing the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer or device may be directed properly from its source to its destination.  Most Internet Service Providers (ISPs) control a range of IP addresses.  IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer or device every time it accesses the Internet.  IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet.  ISPs typically maintain logs of the subscribers to whom IP addresses are assigned on particular dates and times.

8.      To access the Tor network, a user must install Tor software.  That is most easily done by downloading the free "Tor browser" from the Tor Project, the private entity that maintains the Tor network, via their website at www.torproject.org.[3]  The Tor browser is a web browser that is configured to route a user's Internet traffic through the Tor network.

9.      As with other Internet communications, a Tor user's communications are split into packets containing header information and a payload and are routed using IP addresses.  In order for a Tor user's communications to be routed through the Tor network, a Tor user necessarily (and voluntarily) shares the user's IP address with Tor network relay computers, which are called "nodes."  This routing information is stored in the header portion of the packet. As the packets travel through the Tor network, each node is able to see the address information of the previous node the communication came from and the next node the information should be sent to.  Those Tor nodes are operated by volunteers – individuals or entities who have donated computers or computing power to the Tor network in order for it to operate.

10.     Tor may be used to access open-Internet websites like www.justice.gov.  Because a Tor user's communications are routed through multiple nodes before reaching their destination, when a Tor user accesses an Internet website, only the IP address of the last relay computer (the "exit node"), as opposed to the Tor user's actual IP address, appears on that website's IP address log.  In addition, the content of a Tor user's communications are encrypted while the communication passes through the Tor network.  That can prevent the operator of a Tor

---

[3]   Tor users may also choose to manually configure a web browser or other application to route communications through the Tor network.

node from observing the content (but not the routing information) of other Tor users' communications.

11.   The Tor Project maintains a publicly available frequently asked questions (FAQ) page, accessible from its website, with information about the Tor network.  Within those FAQ, the Tor Project advises Tor users that the first Tor relay to which a user connects can see the Tor user's actual IP address.  In addition, the FAQ also cautions Tor users that the use of the Tor network does not render a user's communications totally anonymous. For example, in the Tor Project's FAQ, the question "So I'm totally anonymous if I use Tor?" is asked, to which the response is in bold text, "**No**."

12.   The Tor Network also makes it possible for users to operate websites, such as **Website 2** and **Website 3**, that are accessible only to users operating within the Tor network.  Such websites are called "hidden services" or "onion services." They operate in a manner that attempts to conceal the true IP address of the computer hosting the website.  Like other websites, hidden services are hosted on computer servers that communicate through IP addresses.  However, hidden services have unique technical features that attempt to conceal the computer server's location.

13.   Unlike standard Internet websites, a Tor-based web address is comprised of a series of at least 16 and as many as 56 algorithm-generated characters, for example "asdlk8fs9dflku7f," followed by the suffix ".onion."   Ordinarily, investigators can determine the IP address of the computer server hosting a website (such as www.justice.gov) by simply looking it up on a publicly available Domain Name System ("DNS") listing.  Unlike ordinary Internet websites, however, there is no publicly available DNS listing through which one can query the IP address of a computer server that hosts a

Tor hidden service.  So, while law enforcement agents can often view and access hidden services that are facilitating illegal activity, they cannot determine the IP address of a Tor hidden service computer server via public lookups.   Additionally, as with all Tor communications, communications between users' computers and a Tor hidden service webserver are routed through a series of intermediary computers.  Accordingly, neither law enforcement nor hidden-service users can use public lookups or ordinary investigative means to determine the true IP address – and therefore the location – of a computer server that hosts a hidden service.

14.    Hidden service websites on the Tor Network are not "indexed" by search engines—such as Google—to anywhere near the same degree as websites that operate on the open Internet. Accordingly, it is much more difficult to perform a Google-type search of hidden service websites than it is to search open Internet websites for particular content of interest.  Users interested in accessing child exploitation material (or in advertising child exploitation and pornography websites they operate) therefore keep, maintain, and use directory sites that advertise the web addresses of hidden services that contain child exploitation related content.  Users utilize those directory sites to identify new web forums, chat sites, image galleries, and file hosts pertaining to the sexual exploitation of children.  While they operated, the web addresses for **Websites 2 and 3** were listed on one or more of such directory sites advertising hidden services dedicated to the sexual exploitation of children.

**Website 2**

15.    ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

20-mj-4234-DHH

16.

17.

18.

20-mj-4234-DHH

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

19.   ███████████████████████████████████████████

      ███████████████████████████████████████████



20.   ███████████████████████████████████████████

      ███████████████████████████████████████████

      ███████████████████████████████████████████

      ███████████████████████████████████████████

      ███████████████████████████████████████████

      ███████████████████████████████████████████

      ███████████████████████████████████████████

      ███████████████████████████████████████████

      ███████████████████████████

21.   ███████████████████████████████████████████

      ███████████████████████████████████████████

      ███████████████████████████████████████████

20-mj-4234-DHH



a.

b.

22.



a.



b.

c.





**Website 3**

23. 

24.



25.

26.

27.

28.



███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████

**Evidence Related to Identification of Target that Accessed Website 2 and Website 3**

30.   ███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████████

31.   ███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

32.

33.

20-mj-4234-DHH

34. 

35.



36.    I am also aware through consultation with HSI and FBI agents that the review of detailed
       user data related to one Tor network based child pornography website found that it was
       exceedingly rare for a registered website user to access that website and never return.  FBI
       review of user data from that website found that less than two hundredths of one percent
       of user accounts registered an account on the website, accessed a message thread on the
       website, and then never returned to the website and logged in to the same account.

37.    Accordingly, based on my training and experience and the information articulated herein,
       because accessing **Website 2** and **Website 3** required numerous affirmative steps by the
       user – to include downloading Tor software, accessing the Tor network, finding the web
       addresses for **Website 2** and **Website 3**, and then connecting to **Website 2** and **Website 3**
       via Tor – it is extremely unlikely that any user could simply stumble upon **Website 2** or
       **Website 3** without understanding their purpose and content.

38.    Accordingly, I submit that there is probable cause to believe that, for all of the reasons
       described herein, any user who accessed **Website 2** and **Website 3** has, at a minimum,
       knowingly accessed **Website 2** and **Website 3** with intent to view child pornography or
       attempted to do so.

## **Identification of SUBJECT PREMISES**

39.    According to publicly available information, IP address 96.230.213.63 — the one used to access **Website 2** and **Website 3**, as described above — is owned/operated by Verizon Fios. On or about March 20, 2020, an administrative subpoena was issued to Verizon Fios for information related to IP address 96.230.213.63 on the following dates and times: May 12, 2019 at 19:10:51 UTC and May 12, 2019 at 19:27:24 UTC, respectively.  Verizon Fios provided the following subscriber details for the IP address on those dates:

| | |
|---|---|
| **Customer name:** | Alexander Kiejzo |
| **Account address:** | 17 Joan Cir |
| | Milf (sic), MA 01757 (the SUBJECT PREMISES) |
| **Account Creation Date:** | 08/31/2012 |
| **Status:** | Active |

40.    Commercial databases indicate that Alexander Kiejzo resides at the SUBJECT PREMISES. A query of the Worcester Registry of Deeds website indicated the SUBJECT PREMISES has been owned by Alexander Kiejzo since 1994. Open source research indicates that it is a single-family home.

41.    Records from the Massachusetts Registry of Motor Vehicles (RMV) as of June 2020 show that Alexander Kiejzo (YOB 1955), Lianne Kiejzo (YOB 1989), and Vincent Kiejzo (YOB 1987) all have active Massachusetts driver's licenses, each of which includes a photograph and designation of the SUBJECT PREMISES as their residential address.

42.    Through consultation with the United States Postal Service (USPS), agents confirmed that the residents currently receiving mail at the SUBJECT PREMISES bear the names Alex Kiejzo and Vincent Kiejzo.[5]

---

5   Additional record checks suggest that Lianne Kiejzo currently resides out of state in Oregon.

43.  On September 4, 2020, agents conducting surveillance at the SUBJECT PREMISES observed a man matching the likeness of the male depicted in the RMV photograph of Alexander Kiejzo depart the residence on foot at approximately 6:45 a.m.

44.  On September 8, 2020, agents conducting surveillance at the SUBJECT PREMISES observed a man matching the likeness of the male depicted in the RMV photograph of Vincent Kiejzo departing the SUBJECT PREMISES at approximately 6:30 a.m., operating a blue 2020 Acura RDX, MA REG WS1181.[6]  Agents observed this same vehicle parked at Memorial Elementary School in Milford at approximately 7:25 a.m.

45.  According to the Milford Police Department, Vincent Kiejzo was issued a Firearms Identification Card in May 2017 which includes designation of the SUBJECT PREMISES as his residential address.  There are seven firearms registered to Vincent Kiejzo.

46.  Through open source research, agents located a LinkedIn page for Vincent Kiejzo which lists his employment from 2013 to the present as a second grade teacher at Milford Public Schools.  The LinkedIn page also listed employment from 2017 with a position of Co-Founder/President of Milford Massachusetts Foundation for Education, Inc.  Additionally, the following employments are listed on the LinkedIn profile: pool supervisor/swimming lesson supervisor at Milford Community School Use Program, with employment dates of 2001 to the present; elementary instructional technology specialist at Milford Public Schools, with employment dates of 2012-2013; and one-to-one behavior specialist at Milford Public Schools, with employment dates of 2008 to 2012. The male depicted in the picture on the LinkedIn profile appears to match the likeness of the male depicted in the

---

6 The Acura is registered to Honda Lease Trust of Holyoke, MA.

20-mj-4234-DHH

RMV photograph of Vincent Kiejzo.  Publicly accessible websites associated with Milford schools also show Vincent Kiejzo as a second grade teacher.

47.    On September 2, 2020, I traveled to the SUBJECT PREMISES and used an openly available wireless network discovery tool to search for available wireless networks, while parked in front of the SUBJECT PREMISES. This produced two wireless networks in the area, both secured, which appeared to be associated with the SUBJECT PREMISES: named KIEJZO and KiejzoSH.

## CHARACTERISTICS COMMON TO CONSUMERS OF CHILD PORNOGRAPHY

48.    Based on my previous training and experience related to investigations involving child pornography and the sexual abuse of children, I have learned that individuals who create, possess, receive, distribute, or access with intent to view child pornography (collectively, "consumers" of child pornography) have a sexual interest in children and in images of children.  Based upon my knowledge, experience, and training in child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to such consumers of child pornography, as outlined in the following paragraphs.

49.    The majority of consumers of child pornography are persons who have a sexual attraction to children.  They receive sexual gratification and satisfaction from sexual fantasies fueled by depictions of children that are sexual in nature.

50.    Consumers of child pornography may collect sexually explicit materials, which may consist of photographs, magazines, motion pictures, video tapes, books, slides, computer graphics, or digital or other images for their own sexual gratification.  These individuals often also collect child erotica, which may consist of images or text that do not rise to the

level of child pornography, but which nonetheless fuel their deviant sexual fantasies involving children.  Non-pornographic, seemingly innocuous images of minors are often found on computers and digital storage devices that also contain child pornography, or that are used to communicate with others about sexual activity or interest in children.  Such images are useful in attempting to identify actual minors depicted in child pornography images found during the execution of a search warrant.  In certain cases, such images may also assist in determining the origins of a particular child pornography image or series of images.

51.    Many consumers of child pornography maintain their sexually explicit materials for several years and may go to great lengths to conceal and protect from discovery, theft, and damage their collections of illicit materials.  They regularly maintain their collections in the privacy and security of their homes, inside their cars, on their person, or in cloud-based online storage. Depending on their technical expertise, access to child pornography on seemingly "safe" networks like Tor, or struggle with addiction to child pornography, many consumers of child pornography have been found to download, view, and then delete child pornography on their digital devices on a cyclical and repetitive basis.

52.    Importantly, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools.  Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.[7]

---

[7]    See United States v. Carroll, 750 F.3d 700, 706 (7th Cir. 2014) (concluding that 5-year delay was not too long because "staleness inquiry must be grounded in an understanding of both the behavior of child pornography collectors and of modern technology"); see also United States v. Seiver, 692 F.3d 774 (7th Cir. 2012) (Posner, J.) (collecting cases, e.g., United States v. Allen, 625 F.3d 830, 843 (5th Cir. 2010); United States v. Richardson, 607 F.3d 357, 370-71 (4th Cir. 2010); United States v. Lewis, 605 F.3d

53.     Consumers of child pornography often seek out like-minded individuals, either in person

or on the Internet, to share information and trade depictions of child pornography and child

erotica as a means of gaining status, trust, acceptance, and support.  This contact helps

these individuals to rationalize and validate their deviant sexual interest and associated

behavior.  Furthermore, individuals who would have knowledge about how to access a

hidden and embedded chat site would have gained knowledge of its location through online

communication with others of similar interest.  The different Internet-based vehicles used

by such individuals to communicate with each other include, but are not limited to, e-mail,

bulletin boards, chat sites, web forums, instant messaging applications, and other similar

vehicles of communication.

54.     Consumers of child pornography often collect, read, copy, or maintain names, screen

names or nicknames, addresses (including e-mail addresses), phone numbers, or lists of

persons who have advertised or otherwise made known in publications and on the Internet

that they have similar sexual interests.  These contacts are maintained as a means of

personal referral, exchange, or commercial profit.  These names may be maintained in the

original medium from which they were derived, in written hardcopy, on computer storage

devices, or merely on scraps of paper.

55.     Based upon training and experience, I know that persons engaged in the production and

possession of child erotica are also often involved in the production and possession of child

pornography.  Likewise, I know from training and experience that persons involved in the

production and possession of child pornography are often involved in the production and

possession of child erotica.

---

395, 402 (6th Cir. 2010)).

56.    Based on my training, knowledge, experience, and conversations with others in law enforcement, I understand that an individual who possesses images and/or videos depicting child pornography on one digital storage device and/or Internet email or online storage account is likely to possess child pornography on additional digital storage devices and/or Internet email or online storage accounts that he possesses or controls.  Additionally, based on this training and experience, I understand that even if the target uses a portable device (such as a mobile phone) to access the Internet and child pornography, it is more likely than not that evidence of this access will be found in his home, the SUBJECT PREMISES, as set forth in <u>Attachment A</u>, including on digital devices other than the portable device (for reasons including the frequency of "backing up" or "synching" mobile phones to computers or other digital devices).

57.    Based on all of the information contained herein, I believe that an internet user residing at the SUBJECT PREMISES likely displays characteristics common to consumers of child pornography. In particular, the target of this investigation obtained and used Tor network software, found the web addresses for **Website 2** and **Website 3**, and accessed online child sexual abuse and exploitation material via **Website 2** and **Website 3**.  In my experience, individuals who rely on access to materials depicting the sexual abuse of children through the Tor network tend to have sophisticated expertise with computers and they are typically individuals who are taking steps to hide their viewing of child exploitation materials.

20-mj-4234-DHH

## BACKGROUND ON COMPUTERS AND CHILD PORNOGRAPHY

58.     I have had training and experience in the investigation of computer-related crimes, including those involving child pornography.  Based on my training and experience, I know the following:

a.      Computers and digital technology are the primary way in which individuals interested in child pornography interact with each other.  Computers basically serve four functions in connection with child pornography:  production, communication, distribution, and storage.

b.      Digital cameras and smartphones with cameras save photographs or videos as a digital file that can be directly transferred to a computer by connecting the camera or smartphone to the computer, using a cable or via wireless connections such as "WiFi" or "Bluetooth."  Photos and videos taken on a digital camera or smartphone may be stored on a removable memory card in the camera or smartphone.  These memory cards are often large enough to store thousands of high-resolution photographs or videos.

c.      The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography.  The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years.  Electronic storage media of various types – to include computer hard drives, external hard drives, CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices that are plugged into a port on the computer – can store thousands of images or videos at very high resolution.  It is extremely easy for an individual to take a photo or a video with a

digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices.  Some media storage devices can easily be concealed and carried on an individual's person.  Smartphones and/or mobile phones are also often carried on an individual's person.

d.      The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

e.      Individuals also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Google, Yahoo!, and Hotmail, among others.  The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats.  A user can set up an online storage account from any computer with access to the Internet.  Evidence of such online storage of child pornography is often found on the user's computer.  Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer in most cases.

f.      As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes.  Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others).  In addition to electronic

communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used.

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

59.   As described above and in <u>Attachment B</u>, this application seeks permission to search for records that might be found on the SUBJECT PREMISES, in whatever form they are found.  One form in which the records are likely to be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

60.   Based on my training, experience, and information provided by other law enforcement officers, I know that many cell phones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers.  Phones have capabilities that include serving as a wireless telephone to make audio calls, digital camera, portable media player, GPS navigation device, sending and receiving text messages and emails, accessing the internet, and storing a range and amount of electronic data.  Examining data stored on devices of this type can uncover, among other things, evidence of communications and evidence of communications and evidence that reveals or suggests who possessed or used the device.

61.   I submit that if a computer or storage medium is found on the SUBJECT PREMISES, there is probable cause to believe those records referenced above will be stored on that computer or storage medium, for at least the following reasons:

62.   Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto

a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.

63.     Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.  Deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

64.     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  This forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

65.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  An internet browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

66.     As further described in <u>Attachment B</u>, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT PREMISES because:

    a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

    b.     Information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or

storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.   The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, computers typically contain information that logs: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the Internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.   Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an

incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

67.   A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

68.   The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

69.   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on

a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

70.     I know that when an individual uses a computer to obtain or access child pornography, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The computer is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

71.     Based on my knowledge and training and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software, and storage media ("computer equipment") be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized. This is true because of:

a.      The volume of evidence — storage media such as hard disks, flash drives, CDs, and DVDs can store the equivalent of thousands or, in some instances, millions of pages of information.  Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names.  Searching authorities may need to

examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity.  This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site.

b.      Technical requirements — analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment.  The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications.  Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data.  Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, or encrypted files.  Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches.  Additionally, computer evidence is extremely vulnerable to tampering or destruction, both from external sources and destructive code imbedded in the system as a "booby trap."

Consequently, law enforcement agents may either copy the data at the premises to be searched or seize the computer equipment for subsequent processing elsewhere.

72.   The premises may contain computer equipment whose use in the crime(s) or storage of the things described in this warrant is impractical to determine at the scene.  Computer equipment and data can be disguised, mislabeled, or used without the owner's knowledge.  In addition, technical, time, safety, or other constraints can prevent definitive determination of their ownership at the premises during the execution of this warrant.  If the things

described in Attachment B are of the type that might be found on any of the computer equipment, this application seeks permission to search and seize it onsite or off-site in order to determine their true use or contents, regardless of how the contents or ownership appear or are described by people at the scene of the search.

73.   The law enforcement agents will endeavor to search and seize only the computer equipment which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence in Attachment B.  If however, the law enforcement agents cannot make a determination as to use or ownership regarding any particular device, the law enforcement agents will seize and search that device pursuant to the probable cause established herein.

74.   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

75.   This warrant authorizes a review of electronic storage media seized, electronically stored information, communications, other records and information seized, copied or disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical

experts.  Pursuant to this warrant, HSI may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## CONCLUSION

76.  Based on the foregoing, I submit there is probable cause to believe that violations of 18 U.S.C. §§ 2252A(a)(2) and (b)(1) (Attempted Receipt of Child Pornography) and 2252A(a)(5)(B) and (b)(2) (Access with Intent to View and Possession of Child Pornography, and attempt) have occurred, and that the contraband, property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment B of this Affidavit, are located at the SUBJECT PREMISES, described in Attachment A.  I respectfully request that this Court issue a search warrant for the SUBJECT PREMISES as described in Attachment A, authorizing the seizure and search of the items described in Attachment B.

Caitlin Moynihan
Special Agent
Homeland Security Investigations

Sworn and subscribed before me telephonically pursuant to Fed. R. Crim. P. 4.1 this __8th__ day of September, 2020.     5:21 p.m.

HONORABLE DAVID H. HENNESSY
United States Magistrate Judge